## Foodarama Supermarkets Inc. v. American Insurance Company

C.P. of Philadelphia County, no. 9802-1138.

*Melvyn I. Weiss* and *James J. Binns,* for plaintiffs.
*Mark A. Aronchick,* for defendant.

LEVIN, *J.,* January 10, 2000—Before this court are plaintiffs' motion for class certification, defendants' memorandum of law in opposition to plaintiffs' motion for class certification and all responses thereto. For the reasons stated below we deny plaintiffs' motion.

## INTRODUCTION

This class action litigation pits workers' compensation insurance purchasers against workers' compensation insurers. Plaintiffs define their class as "all employers in the Commonwealth of Pennsylvania that have purchased or renewed retrospectively-rated or adjusted policies or other similarly loss-sensitive policies in the voluntary market since 1985." [1] Defendants are all workers' compensation insurers who not only sold policies to the 11 named plaintiffs but also who are alleged to have written or sold workers' compensation insurance to employers doing business in the Commonwealth.[2] Plaintiffs allege that the defendant insurers engaged in a "fraudulent scheme and

---

1. Pls.' second am. compl. at ¶5. There are 11 named plaintiffs in this action: Foodarama Supermarkets Inc., WSR Corp., Andrew Corporation, American Association of Retired Persons Inc., Dal-Tile Corporation, The ERM Group, Matria Healthcare Inc., Melvin Simon & Associates Inc., Specialty Restaurants Corp., Alumax Inc. and Strick Corp.

2. There are 13 insurance companies who sold policies to the 11 named plaintiffs: Insurance Company of North America, Home Insurance Company, Liberty Mutual Fire Insurance Company, Highlands Insurance Company, Old Republic Insurance Company, Industry Insurance Company, Sentry Insurance—a Mutual company, Standard Fire Insurance Company, Travelers Casualty and Surety Company, Reliance Insurance Company, Pacific Employers Insurance Company, Zurich Insurance Company and Travelers Indemnity.

conspiracy . . . to bolster their profits in the face of substantial losses they began incurring in the mid-1980s in connection with the residual market for workers' compensation insurance in Pennsylvania[3] and many other states." (Pls.' second am. compl. ¶2.)

To understand plaintiffs' complaint, a brief explanation about loss-sensitive policies and the residual market is required. Under loss-sensitive policies an employer's premium depends upon the amount of actual losses the employer incurs.[4] The premiums and charges are adjusted annually to reflect the employer's losses. Plaintiffs contend that the yearly adjustment "afford the defendant carriers the opportunity to layer illegal charge upon illegal charge." (Pls.' second am. compl. at ¶28.) A retrospectively-rated policy is a type of loss-sensitive policy that uses four elements to calculate the premium.[5]

---

3. Pennsylvania has in place a Workers' Compensation Act, 77 P.S. §1. The purpose of the Act is to provide sole and exclusive means of recovery for all injuries incurred within the course of employment. The Act is to provide a state-run program of accident insurance, rather than an assigned risk plan, that insures quick and certain payment for the work-related injuries of those covered by the Act without resort to the court system.

4. Plaintiffs describe this type of policy as a "loss-sensitive policy."

5. The plaintiffs describe the four elements as:

"(1) Basic premium—reflecting the insurer's acquisition costs (*e.g.* commission), operating expenses (underwriting, loss control services, audit, general administration etc.), insurance charge and profit; (2) Incurred losses—reflects actual losses paid, loss reserves, subrogation expenses, interests on judgments, and in some cases allocated loss adjustment expenses; (3) Loss conversion factor—reflecting claim adjustment expenses and the cost of the carrier's claim services, such as investigation of claims and filing of claim reports; and (4) Tax multiplier—reflecting state premium taxes licenses fees and miscellaneous

Plaintiffs assert that these elements along with rates, fees, factors, charges, loads and assessments are filed with the Commonwealth's Insurance Commissioner and cannot be changed unless approved by the commissioner.

Broadly speaking, plaintiffs' claim asserts that defendants charged more in premiums than the law or their insurance contracts allowed in order to recoup losses the insurers were sustaining in the residual market. The residual market comprises employers who do not choose their insurer but are assigned to certain insurers. Thus, residual market employers obtain their insurance involuntarily because their insurers are assigned and not chosen. The plaintiffs are voluntary market participants and the defendants sell on both the voluntary and involuntary market. Plaintiffs contend that it is unlawful for insurance companies to overcharge voluntary market policyholders to recoup losses incurred by the insurers in the residual market.

Plaintiffs allege that "defendants, individually and acting in concert, schemed to bilk the named plaintiffs and other insureds in the voluntary market in Pennsylvania and other states out of more than $1 billion." (Second am. compl. ¶4.) Defendants allegedly carried out their scheme in five ways: (1) misrepresenting and inflating the applicable tax multiplier used in calculating the final premium; (2) imposing illegal and unauthorized residual market assessments against voluntary market carriers; (3) using an illegally inflated loss conversion factor; (4)

---

assessments (not including residual market assessments) that insurer must pay on the premium it collects." (Pls.' second am. compl. ¶29(a)-(d).)

misrepresenting and illegally inflating the basic premium amounts; and (5) requiring insurers to purchase coverage that was unrequested and unnecessary. (Pls.' second am. compl. at ¶38(a)-(e).)

Based in part on these allegations, plaintiffs assert five causes of action against defendants[6] and also allege that defendants fraudulently concealed their allegedly unlawful actions.

## FINDINGS OF FACT

(1) Plaintiffs seek certification of a class consisting of:

"All employers in the Commonwealth of Pennsylvania that purchased or renewed multi-state policies issued by the insurer defendants covering risks within the Commonwealth of Pennsylvania during the period from January 1, 1985 to the present (the "class period"). Excluded from the class are defendants and members of the NCCI; each of their parents, subsidiaries, and affiliates; any person controlled by any excluded person; and the legal representatives, heirs, successors, and assigns of any excluded person." Pls.' motion at 1.

(2) Policies are defined in the complaint to include retrospectively-rated, retrospectively-adjusted, or other loss-sensitive workers' compensation insurance policies purchased in the voluntary market. Compl. ¶55.

---

6. Plaintiffs' causes of action are (1) breach of contract; (2) common-law fraud; (3) civil conspiracy; (4) unjust enrichment and (5) negligence.

(3) Plaintiff Foodarama Supermarkets Inc. is a New Jersey corporation that purchased a policy issued by defendant Insurance Company of North America, a member of the CIGNA Group, covering Foodarama's Pennsylvania employees for the policy year ending June 1, 1992. Compl. ¶12; INA's answer ¶12.

(4) Plaintiff Andrew Corporation is a Delaware corporation that purchased a policy issued by defendant INA, among other things, covering Andrew's Pennsylvania employees for the policy year ending December 1, 1992. Andrew also purchased a policy issued by defendant Liberty Mutual Fire Insurance Company, a member of the Liberty Group, covering Andrew's Pennsylvania employees for the policy year ending December 1, 1991. Compl. ¶13; Liberty Mutual's answer ¶13.

(5) Plainntiff The ERM Group Inc. is a Pennsylvania corporation that purchased policies issued by defendant Old Republic Insurance Company, a member of the Old Republic Group, covering ERM's Pennsylvania employees for the policy years ending October 15, 1990 through October 15, 1994. Compl. ¶15; Old Republic's answer ¶15.

(6) Plaintiff Matria Healthcare Inc., the successor in interest to Healthdyne Inc., is a Delaware corporation that purchased policies issued by defendant Sentry Insurance, a Mutual company, a member of the Sentry Group, covering Matria's Pennsylvania employees for the policy periods ending June 1, 1991 through March 8, 1996. Matria also purchased a policy issued by defendant Commerce and Industry Company, a member of the AIG Group, covering Matria's Pennsylvania employees

for the policy year ending June 1, 1990. Compl. ¶16; Commerce and Industry's answer ¶16.

(7) Plaintiff Melvin Simon & Associates Inc. is an Indiana corporation that purchased policies issued by defendant Standard Fire Insurance Company, a member of the Travelers Group, covering Melvin Simon's Pennsylvania employees for the policy years ending July 1, 1990 and July 1, 1991. Compl. ¶17; Standard Fire's answer ¶17.

(8) Plaintiff Specialty Restaurants Corporation d/b/a Baby Doe's is a California corporation that purchased policies issued by defendants United Pacific Insurance Company, a member of the Reliance Group, covering Specialty Restaurants' Pennsylvania employees for the policy years ending December 1, 1990 and December 1, 1991. Compl. ¶18; United Pacific's answer ¶18.

(9) Plaintiff Alumax Inc. is a Delaware corporation that purchased policies issued by defendant Pacific Employers Insurance Company, a member of the CIGNA Group, covering Alumax's Pennsylvania employees for the policy years ending January 1, 1986 through April 1, 1990. Compl. ¶19; Pacific Employers' answer ¶19.

(10) Plaintiff Strick Corporation d/b/a Distribution International Inc. is a Delaware corporation that purchased policies issued by defendant Zurich Insurance Company, a member of the Zurich-American Group, covering Strick's Pennsylvania employees for the policy years ending January 1, 1992, January 1, 1993 and January 1, 1996. Compl., ¶20; Zurich's answer ¶20.

(11) Plaintiff Charter Medical Executive Corporation is a Georgia corporation that purchased policies issued

by defendant National Union Fire Insurance Company of Pittsburgh, a member of the AIG Group, covering Charter Medical's Pennsylvania employees for the policy years ending April 1, 1992 and April 1, 1993. Charter Medical also purchased a policy issued by defendant Reliance National Indemnity Company (f/k/a Planet Insurance Company), a member of the Reliance Group, covering Charter Medical's Pennsylvania employees for the policy year ending October 1, 1994. Compl. ¶21; National Union's answer ¶21.

(12) Plaintiff U.S. Natural Resources Inc. is a Delaware corporation that purchased a policy issued by defendant American Manufacturers Mutual Insurance Company, a member of the Lumbermens Group, covering USNR's Pennsylvania employees for the policy year ending August 1, 1990. Compl. ¶22; American Manufacturers' answer ¶22.

(13) Each insurer defendant does business in Pennsylvania by soliciting, making, and delivering workers'compensation insurance contracts within the Commonwealth of Pennsylvania. Defendants' answers ¶9.[7]

(14) The National Council on Compensation Insurance Inc., a Florida not-for-profit corporation, is an industry service organization, which plaintiffs allege is managed, controlled, and funded by the insurer defendants. Defendant NCCI maintains an office in Wayne, Pennsylvania. Compl. ¶51; NCCI's answer ¶51.

---

7. References to "defendants' answers ¶__" should be read to include citations to each defendant's answer.

(15) The complaint asserts the following claims: breach of contract, fraud, civil conspiracy, and unjust enrichment.

(16) There are several types of workers' compensation insurance programs, including, but not limited to, loss-sensitive insurance, retrospectively-rated insurance, guaranteed cost insurance, high deductible programs and self insurance.[8]

(17) Unlike guaranteed cost insurance, for which the employer pays a single fixed premium, a retrospectively-rated workers' compensation insurance program combines expense factors and loss experience together in varied ways, depending on the program, such that the amount of the premium at the end of the policy period is affected by the amount of the insured's covered losses. When the loss experience is less than anticipated, refunds or credits are issued; where the actual loss experience is greater than anticipated, additional premiums are required.[9]

(18) High deductible policies are workers' compensation policies where the employer agrees to reimburse the insurer for losses and certain associated expenses, up to an agreed amount per accident. In return, the premium for the policy is reduced through credits to reflect the employer's responsibility to reimburse the insurer up to the amount of the deductible. The exact losses and associated expenses reimbursed, as well as the terms of pay-

8. See *e.g.,* deposition of Thomas Quinn/Standard Fire at 179; deposition of LuAnn Brinkley/Matria at 88; deposition of John McCauley/Charter at 41-42; Slotznick affidavit, ¶25; Scheffman report, p. 12.

9. Slotznick affidavit, ¶¶25, 31; Scheffman report, p. 13.

ment, will vary from company to company and from employer to employer. In contrast to the reimbursement payments, which are not premium, the amount of the premium for a high deductible policy is generally fixed and thus is not loss-sensitive. The high deductible premium generally will not vary based upon the actual losses incurred for injuries occurring during the policy period.[10]

(19) Dividend plans are plans that are often used in conjunction with guaranteed cost or retrospectively-rated policies and provide that, at the discretion of the insurer's board of directors, a portion of the insurer's surplus may be returned to the policyholder under certain conditions. These plans generally allow for a dividend payment where either certain administration expenses were less than average, or losses and associated expenses were less than anticipated. While dividend plans vary from company to company and over time, some variable dividend plans pay a dividend to a specific policyholder based on that policyholders' individual loss experience.[11]

(20) Workers' compensation programs can include in a single agreement coverage for risks in multiple states ("multi-state" programs) and can also include additional lines of insurance, such as general liability and auto liability ("multi-line" programs). Such programs may also include endorsements for supplemental coverages such as stop gap coverages, foreign voluntary compensation, and United States Longshoremen's and Harbor Workers' exposures.

---

10. Slotznick affidavit, ¶¶65-66; *Workers' Comp., A Complete Guide to Coverage, Laws and Cost Containment*, L. Robinson and A. Rudds, ed. 1998, at XI.P.7, cited in Scheffman report, p. 19 n.37.

11. *Id.* at XI.M.1.

(21) All of the insurance transactions upon which plaintiffs base their complaint involve insurance coverage in multiple states.[12] Thus, the insurance statutes, regulations and rules of most, if not all, of the 50 states are implicated by plaintiff's claims in this lawsuit and require an individualized analysis to determine which law applies and how it applies.

(22) Regulation of workers' compensation insurance varies and has varied from state to state and, over time, within each state. An individualized analysis is required to determine which state's law applies to the various elements of each plaintiff's claim for any specific program at any particular point in time.

(23) Pennsylvania insurance law, as with most states, requires employers to provide workers' compensation coverage for employees injured within the scope of their employment.[13] Insurers, however, are not required to write coverage for any particular employer.[14]

(24) Employers usually purchase coverage in the "voluntary" market. Employers that are unable to secure coverage in the voluntary market can obtain it through assigned risk plans that are typically created by state legislation.[15] In Pennsylvania, the Pennsylvania State Workers' Compensation Insurance Fund provides assigned risk coverage and also competes to provide insurance in the voluntary market. The Commonwealth provides financial support if the state fund incurs any overall losses. In

---

12. Slotznick affidavit, ¶¶1-8.

13. *Id.,* ¶21.

14. Scheffman report, p. 12.

15. Slotznick affidavit, ¶21; Scheffman report, p. 15.

other states, assigned risk coverage is generally written by one or more servicing carriers, and then reinsured through a reinsurance mechanism pursuant to which voluntary market carriers share on a proportional basis any operating losses resulting from such policies.[16]

(25) The market for loss-sensitive workers' compensation insurance products in the voluntary market was very competitive during the time period at issue.[17] Approximately 300 carriers were licensed to sell workers' compensation insurance programs in Pennsylvania from 1985 to the present.[18] Carriers aggressively competed, not just on price, but on the many other terms that are of importance to large corporations.[19] In fact, many plaintiffs made their purchasing decision on factors other than cost.[20] Most of the plaintiffs switched carriers at least once over the term of the putative class period.[21]

(26) In the mid-1980s and into the early 1990s, losses in the residual markets mounted and were assessed to

---

16. Scheffman report, pp. 11-12; Slotznick affidavit, ¶22.

17. See *e.g.,* deposition of Timothy Harcharik/Melvin Simon at 26-27, 63-65; deposition of Mark Forsythe/Melvin Simon at 181; deposition of Brian Woodward/Alumax at 100-101; McCauley/Charter at 26-27; Scheffman report, p. 42.

18. Scheffman report, p. 43.

19. See *e.g.,* McCauley/Charter at 130-36; Harcharik/Melvin Simon at 40-41; Woodward/Alumax at 100-101; deposition of Lawrence Greenwald/Melvin Simon at 83-84; Forsythe/Melvin Simon at 181; Scheffman report, pp. 38-39,

20. See *e.g.,* McCauley/Charter at 130-36; Woodward/Alumax at 109-110; Sevick/ERM at 64-69; Forsythe/Melvin Simon at 51; deposition of Denise Grimes Terry/Charter at 39.

21. See *e.g.,* McCauley/Charter at 130-31; Woodward/Alumax at 85; Sevick/ERM at 70.

carriers who were writing voluntary market workers' compensation coverage in certain states other than Pennsylvania.[22] These assessments increased the cost to the carrier of every dollar of insurance written in the voluntary market.[23] Confronted by these assessments to subsidize residual markets in other states, carriers acted in a number of different ways that were in their individual economic self-interest to respond to the added costs of doing business.[24] Because the Pennsylvania state fund's losses are subsidized by the Commonwealth, the fund does not assess carriers. Pennsylvania insurers were assessed, however, for deficits attributable to coverage provided under the United States Longshoremen's and Harbor Workers' Act, for Pennsylvania employees. Longshoremen's coverage is administered pursuant to federal law.

(27) Defendants did not have a common company-wide practice to impose "RML charges" on insureds in a systematic fashion.[25] Loss-sensitive policies were individually underwritten. Pricing was determined by many factors, which may or may not have included residual market expenses associated with underwriting a specific policy. Even though some defendants published underwriting manuals or written guidelines reflecting how residual market expenses might be factored into an initial

---

22. Scheffman report, pp. 17-19.

23. Scheffman report, pp. 15, 17-18.

24. Scheffman report, p. 19.

25. Quinn/Standard Fire at 150; Woodward/Alumax at 116-17; Millard/Matria at 136; deposition of Louis Wasnesky/Old Republic at 166; deposition of Robert Gerber/Reliance at 116.

proposal by a carrier, the amount of residual market charges (if any) were negotiated with the insured.

(28) The many variations in carriers' treatment of residual market expenses were widely understood by insureds and their brokers, who functioned as agents of the insureds.[26] Residual market assessments were specifically disclosed to insureds or brokers in negotiations over the terms of multi-state loss-sensitive workers' compensation programs.[27]

(29) If carriers had not considered increased residual market assessments in their pricing, some insureds who purchased multi-state loss-sensitive workers' compensation insurance programs in the voluntary market either would have been unable to obtain such coverage[28] or the pricing or other terms of the program would have changed.[29]

(30) Workers' compensation insurance is regulated in Pennsylvania, as in other states. There has not been a single regulatory scheme in effect in Pennsylvania from 1985 to the present however. Consequently, whether or not a particular insurance program complied with applicable rules, regulations and statutes at any particular time

---

26. Johnson & Higgins Casualty Bulletin (March 21, 1989, WAUSA 00202788); Forsythe/Melvin Simon at 120-21; Woodward/Alumax at 116-17; deposition of Brian Mibus/Liberty at 236; Scheffman report, p. 40.

27. Woodward/Alumax at 31-32; McCauley/Charter at 47-49; Sevick/ERM at 101-102; Brinkley/Matria at 59; Millard/Matria at 44-45; Scheffman report, p. 41.

28. Mibus/Liberty at 244; Forsythe/Melvin Simon at 114-15; Scheffman report, p. 16.

29. Forsythe/Melvin Simon at 114-15; Scheffman report, p. 26.

requires an individualized inquiry. From the mid-1980s through the 1990s, the Pennsylvania Legislature and commissioner of insurance, as did the analogous authorities in many states, responded to large employers' demands for greater flexibility in order to achieve lower rates and obtain coverages and program features that they desired.[30]

(31) Effective January 1, 1992, the Pennsylvania Compensation Rating Bureau filed, and the Pennsylvania commissioner approved, a large risk alternative rating option plan for use with Pennsylvania workers' compensation coverage.[31] This LRARO filing specifically authorized carriers to negotiate the structure, parameters and premium rates of retrospetively-rated programs with larger insureds without reference to filed rates or factors.[32] The nature and extent of regulation applicable to LRARO's is different from the regulations applicable to retrospectively-rated workers' compensation insurance.

(32) Pennsylvania also approved use of large deductible programs for workers' compensation insurance. Many of these plans allowed negotiation and reduction of expenses, including RML expenses and, therefore, reduced the price that insureds paid for workers' com-

---

30. 9/13/99 class certification hearing transcript, pp. 141-42; deposition of plaintiffs' expert, Robert Hughes at 104, 106.

31. Defendants' memorandum of law in opposition to plaintiffs' motion for class certification, p. 5 and exhibit D thereto; hearing tr., pp. 145-46.

32. Rec. no. 51 [PCRB LRARO filing]; defendants' mem., pp. 5-6, 13 and exhibit D thereto; Scheffman report, p. 14; hearing tr., pp. 145-46.

pensation insurance.[33] For example, in August 1991, the AIG companies filed a large deductible plan that expressly allowed collection of RML expenses.[34] The nature and extent of regulations applicable to large deductible programs is different from regulation of retrospectively-rated workers' compensation insurance.

(33) Under Pennsylvania regulations, carriers were allowed to file with the PCRB their own rating plans. An example of such a filing is the AIG companies' large risk rating plan. This filing, approved by the Commonwealth in 1992, explicitly references the recovery of RML expenses.[35]

(34) Effective July 2, 1993, the Pennsylvania Legislature adopted a more flexible open competition regulatory framework in which each carrier individually determines its own rates.[36] Under the 1993 statute, the PCRB determines loss costs, expected workers' compensation losses, for insurers to use in making their rates.[37] Carriers can either adopt the PCRB's loss costs or calculate their own expected losses.[38] Carriers determine their rates by combining these loss costs with their expenses.[39]

---

33. Slotznick affidavit, ¶¶24-25; Scheffman report, p. 37.

34. Rec. no. 50 [AIG large deductible plan filing]; hearing tr., pp. 146-47.

35. Rec. no. 52 [AIG large risk rating plan filing]; defendants' mem., pp. 6, 13 and exhibit E [the AIG LRRP filing] attached thereto.

36. 77 P.S. §1035.9 (Supp. 1998); 31 Pa. Admin. Code §120.1(a).

37. 77 P.S. §1035.9 (Supp. 1998); 31 Pa. Admin. Code §§120.1, 120.3, 120.5.

38. 77 P.S. §1035.9 (Supp. 1998); 31 Pa. Admin. Code §120.1.

39. Pa. Admin. Code §120.4; Wasnesky deposition, pp. 72-73; Slotznick affidavit, ¶29.

(35) All of the plaintiffs' multi-state workers' compensation insurance programs were the subject of extensive, separate negotiations. Plaintiffs relied on the advice and counsel of their professional insurance brokers,[40] in-house risk managers,[41] legal counsel,[42] and insurance consultants in those negotiations.[43] The defendants did not have a special or fiduciary relationship with the plaintiffs during the arms-length negotiations.

(36) Plaintiffs obtained customized insurance programs that provided them with valuable benefits beyond those available through more standardized insurance programs they consciously declined to purchase.[44] Plaintiffs negotiated many parameters and features of the programs such as coverage limits, minimum and maximum premiums, loss conversion factors, special services, dividend plans, paid loss features and payment plans that were just as important to plaintiffs as pricing, but were not contained

---

40. Woodward/Alumax at 31-34, 94, 100-101, 103; McCauley/Charter at 20-21, 23-24, 27; Terry/Charter at 34-35; Sevick/ERM at 51-52, 54-55, 62, 70; deposition of Joseph Troilo/Foodarama at 86, 264; Greenwald/Melvin Simon at 48-51, 83-84; deposition of John G. Haase/USNR at 80, 93-94; Brinkley/Matria at 32-34, 37-38, 153; deposition of Carol Lew/Andrew at 21; deposition of Insook Copes/AARP at 13; deposition of James Fromm/Specialty at 24; deposition of John R. Badey (FL)/Strick at 43, 89.

41. Woodward/Alumax at 25-27, 29-30, 60-61, 64-65, 78; McCauley/Charter at 7.

42. Woodward/Alumax at 68-69, 80; Brinkley/Matria at 22-24, 49; Badey (PA)/Strick at 40.

43. Troilo/Foodarama at 192-93, 201-202, 263-65.

44. Woodward/Alumax at 178-79; McCauley/Charter at 28; Sevick/ERM at 233; Slotznick affidavit at ¶¶111-13.

in any filing with the insurance department.[45] The key pricing concern to insureds was the total program price, not the pricing of individual insurance lines (such as workers' compensation or general liability), pricing of individual state coverages, or any amount characterized as a residual market expense.[46]

(37) Because of the individualized negotiations between each plaintiff and its insurance carrier, no two plaintiffs' insurance programs are alike. The carriers did not use uniform methods to price or structure plaintiffs' workers' compensation insurance.[47] For example, some plaintiffs' programs contained a basic premium component (*e.g.,* Matria, Melvin Simon, and Strick), while others did not (*e.g.,* Andrew).[48] The rating plans for some plaintiffs (*e.g.,* Alumax, Charter, and Melvin Simon) changed over time.[49] Many plaintiffs' programs (*e.g.,* Matria) defined a particular component of the premium formula differently than the programs of others (*e.g.,* Melvin Simon and Strick).[50] Some plaintiffs' programs (*e.g.,* AARP) provided combined coverage for several types of insurance, while those of others (*e.g.,* USNR) provided workers' compensation coverage only.[51] Some

---

45. Greenwald/Melvin Simon at 83-85; Woodward/Alumax at 178-80; Forsythe/Melvin Simon at 82-83; Harcharik/Melvin Simon at 103; Scheffman report, p. 29.

46. Troilo/Foodarama at 265; Millard/Matria at 134; Forsythe/Melvin Simon at 51; Harcharik/Melvin Simon at 42.

47. See Slotznick affidavit at ¶¶67-77.

48. *Id.* at ¶¶71, 93-95, 97-98.

49. *Id.* at ¶72.

50. *Id.* at ¶¶73, 93-95, 97-98, 102-104, 106-107.

51. *Id.* at ¶74.

plaintiffs' programs were high deductibles (*e.g.,* AARP, Charter and Strick), others were retrospectively-rated (*e.g.,* Alumax), while others contained both high deductibles and retrospectively-rated policies (*e.g.,* Melvin Simon).[52] The plaintiffs' programs also contained a wide variety of extra coverages, extra benefits, and special payment plans that added value to the insured.[53]

(38) Plaintiffs' contention that all plaintiffs and other Pennsylvania insureds uniformly paid "RML charges" is contradicted by the evidence in the record. For most of the plaintiffs, no evidence was presented to suggest that they were ever charged, or paid, "RML charges" for Pennsylvania coverage.[54] An individual inquiry is necessary to determine if any particular plaintiff or putative class member paid an "RML charge" for Pennsylvania coverage.

(39) Plaintiffs did not rely on any common representations contained in their boilerplate form policies about the existence and/or legality of RML charges in connection with their insurance program. Whether there were any misrepresentations, as well as the nature of any reliance on them by plaintiffs, varies with each plaintiff and is not susceptible to common or class-wide proof. For example: (a) numerous plaintiffs testified that the defen-

---

52. See generally, Slotznick affidavit, appendix 1.

53. See generally, Slotznick affidavit, appendix 1.

54. See *e.g., National Commercial Accounts Department Manual,* section 2004, October 1991, STDFR 00002012; *Calculation of Average Tax Multiplier,* 5/9/90, STDFR 00002612 (Melvin Simon); *Risk Analysis Report,* p. 10, ZURIC 002820 (Strick); *Involuntary Loads, Loss Rating Manual* 9/20/95, RELIA 00078392 (Specialty).

dants made no affirmative misrepresentations to them;[55] (b) to some plaintiffs, the inclusion of RML charges was immaterial to their purchase, since they considered it irrational to focus on anything other than the bottom line when negotiating the price for insurance coverage;[56] and (c) many plaintiffs conceded that they knew that a portion of their premium dollars were to be used to defray their carriers' residual market expenses.[57]

(40) Many plaintiffs never saw, much less relied on, the boilerplate language plaintiffs now claim as the basis of their fraud allegation.[58] Many, if not all, plaintiffs never received copies of such policy language until weeks or months after they had executed written agreements with their carriers detailing the pricing terms of their insurance programs and after their coverage had begun.[59]

---

55. Lew/Andrew at 110-11, 180; McCauley/Charter at 70-71; Brinkley/Matria at 89; Terry/Charter at 22, 36, 70-71; Troilo/Foodarama at 68; Greenwald/Melvin Simon at 166-67; Badey (FL)/Strick at 72-73; Badey (PA)/Strick at 89; Haase/USNR at 161; deposition of John T. Kenny/Specialty at 94, 100-103, 146.

56. *E.g.,* Harcharik/Melvin Simon at 42; Woodward/Alumax at 180-81; Terry/Charter at 40-41; Troilo/Foodarama at 265; Haase/USNR at 139; Lew/Andrew at 177-78.

57. Woodward/Alumax at 92, 111, 113, 116-17; Terry/Charter at 23, 35, 71; McCauley/Charter at 47-50, 59-62, 71, 77-78, 80, 110-11, 115; Sevick/ERM at 101-102, 128, 215; Troilo/Foodarama at 62-64, 66-67, 143, 204-205; Greenwald/Melvin Simon at 65-66; Haase/USNR at 114-15; Brinkley/Matria at 44, 59-61, 71, 73, 79-81, 86-87, 138-39.

58. See Badey (PA)/Strick at 40; McCauley/Charter at 70-71; Brinkley/Matria at 135-37, 150-51; deposition of Leonard Barkan/Strick at 45-46; exhibit F; Troilo/Foodarama at 44.

59. See Badey (PA)/Strick at 40; McCauley/Charter at 70-71; Brinkley/Matria at 135-37, 150-51; Barkan/Strick at 45-46. At most, therefore, the purportedly uniform misrepresentations on which plain-

Some plaintiffs admit that they never relied on any representation by their carrier that filed rates, manuals, or other filings would form the basis of their premium.[60] In any case, evidence concerning each plaintiff's alleged reliance would vary plaintiff by plaintiff.

(41) Each plaintiff had actual or imputed knowledge of insurance regulations and of any variations between its insurance program and applicable filings. Many of the plaintiffs employed professional risk managers who were knowledgeable about the regulation of rates for workers' compensation insurance.[61] Many relied on lawyers to evaluate their insurance agreements.[62] Most, if not all, plaintiffs employed—as their agents—professional insurance brokers and consultants to assist them in soliciting proposals from workers' compensation carriers and in evaluating the proposals they received.

(42) Plaintiffs presented no evidence of any meeting or other event in which a plan was formed, and even if it is presumed to have occurred, have presented no evidence to suggest when it occurred.

---

tiffs depend are misrepresentations in the course of performance, which, under Pennsylvania's "gist of the action" doctrine, are not actionable in fraud. See *Sunquest Info. Sys. v. Dean Witter Reynolds Inc.,* 40 F. Supp.2d 644, 651 (W.D. Pa. 1999).

60. See Badey (PA)/Strick at 40; McCauley/Charter at 70-71; Brinkley/Matria at 135-37, 150-51; Barkan/Strick at 45-46; Troilo/Foodarama at 44.

61. See *e.g.,* Woodward/Alumax at 25-27, 29-30, 60-61, 64-65, 78; McCauley/Charter at 7.

62. Woodward/Alumax at 68-69, 80; Brinkley/Matria at 22-24, 49; Badey (PA)/Strick at 40.

(43) There is no evidence of concerned activity among the defendants or any other carriers throughout the 15-year class period, or any particular period within that 15-year span to uniformly include "RML charges."

(44) Plaintiffs have presented no evidence from which class-wide impact of any conspiracy can be determined.

(45) Counterclaims have been asserted against Alumax, Foodarama and ERM by their carriers for substantial damages. The counterclaims assert that the insureds paid less than the filed premium for certain of their loss-sensitive workers' compensation programs. Sentry also asserted a counterclaim against Matria, claiming a return of dividends. Counterclaims raise numerous issues which will vary from policy to policy because they implicate the same complex comparison of filed premium with the sold program.

(46) Insureds with a complaint about their insurance programs are able and willing to bring their own individual lawsuits for alleged workers' compensation overcharges without the need for a class action. Some have already done so. For example, plaintiff Charter Medical Corporation filed its own suit in Superior Court in the State of Arizona on June 26, 1998, six months before it joined this lawsuit, alleging that it was overcharged for its workers' compensation insurance.[63] The damages Charter seeks in its individual Arizona lawsuit include the amounts claimed here.[64] Scores of other individual

---

63. See Arizona complaint; defendants' mem., exhibit, I; Terry/Charter at 15.

64. Terry/Charter at 16-17.

plaintiffs have also pursued individual claims in the Arizona lawsuit.[65]

(47) The damages claimed by the named plaintiffs are large enough to be pursued as individual actions. The three plaintiffs who have disclosed information concerning the size of their claims allege that they seek damages of hundreds of thousands of dollars. Matria claims damages in excess of $500,000.[66] Melvin Simon claims damages of $476,236.[67] Andrew claims damages in excess of $100,000.[68] Accordingly, the claims as alleged by the plaintiffs would be large enough to warrant a conclusion that they can be pursued individually.

(48) The choice of law applicable to any particular contractual relationship will require individual inquiry into such matters as the states of incorporation of the plaintiff and defendant, their principal place of business, where the contracts were negotiated, where the contracts were written, what states and lines are included within the contract, choice of law provisions contained in the contract, et cetera.

(49) It is likely that the law of most, if not all, states will be applicable to various claims in this action.

(50) There are significant differences in the applicable law of the 50 states. Indeed, plaintiffs' own analysis demonstrates differences in the law.

---

65. Arizona complaint.

66. Millard/Charter at 101, 129-30.

67. Defendants' mem., p. 48.

68. Lew/Andrew at 173.

(51) Plaintiffs did not provide the court with any case management plan that addresses the complexities of managing this case, nor did they provide the court with any plan that addresses the variations in state law that would be faced in this action. There is no evidence to suggest that a jury may be clearly and properly charged on the various claims that may be tried here, should this action proceed an a class-wide basis.

## DISCUSSION

It is this court's present responsibility to determine whether plaintiffs' suit is properly certifiable as a class action. In this respect, our authority is limited by the Pennsylvania Rules of Civil Procedure: "[t]he hearing is confined to a consideration of the class action allegations and is not concerned with the merits of the controversy or with attacks on the other averments of the complaint. Its only purpose is to decide whether the action shall continue as a class action or as an action with individual parties only." Pa.R.C.P. 1707 (explanatory note-1977). Thus, for the time being, we must refrain from ruling on plaintiffs' ultimate right to recovery and on the merits of any defenses raised.

Our decision at this stage is limited to whether plaintiffs[69] have satisfied the requirements described in Pennsylvania Rule of Civil Procedure 1702:

---

69. The burden of proving that class certification is appropriate clearly falls upon the party seeking certification. *D'Amelio v. Blue Cross of Lehigh Valley,* 347 Pa. Super. 441, 449, 500 A.2d 1137, 1141 (1985); *Janicik v. Prudential Insurance Co. of America,* 305 Pa. Super. 120, 128, 451 A.2d 451, 454 (1982).

*"Rule 1702: Prerequisites to a class action*

"One or more members of a class may sue or be sued as representative parties on behalf of all members in a class action only if

"(1) the class is so numerous that joinder of all members is impracticable;

"(2) there are questions of law or fact common to the class;

"(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class;

"(4) the representative parties will fairly and adequately assert and protect the interests of the class under the criteria set forth in Rule 1709; and

"(5) a class action provides a fair and efficient method for adjudication of the controversy under the criteria set forth in Rule1708."

In determining if these criteria are satisfied, the court is clearly vested with broad discretion. *Cambanis v. Nationwide Insurance Co.,* 348 Pa. Super. 41, 51, 501 A.2d 635, 640 (1985) (court has authority to certify certain claims, issues or forms of relief and not others); *Janicik v. Prudential Insurance Co. of America,* 305 Pa. Super. 120, 135, 451 A.2d 451, 457 (1982) (same). See Pa.R.C.P. 1710(c)(I); *Klemow v. Time Inc.,* 466 Pa. 189, 197, 352 A.2d 12, 16 (1976); *Prime Meats Inc. v. Yochim,* 422 Pa. Super. 460, 467, 619 A.2d 769, 773 (1993).

However, we recognize that decisions in favor of maintaining a class action should be liberally made. *D'Amelio,* 347 Pa. Super. at 448, 500 A.2d at 1141; *Bell v. Beneficial Consumer Discount Co.,* 241 Pa. Super. 192, 205,

360 A.2d 681, 688 (1976) (class suits enable the assertion of many meritorious claims that might not otherwise be litigated). Accord *Janicik,* 305 Pa. Super. at 128, 451 A.2d at 454.

In exercising our discretion, this court recognizes that the burden of proving that class certification is appropriate clearly falls upon the party seeking certification. *D'Amelio v. Blue Cross of Lehigh Valley,* 347 Pa. Super. 441, 449, 500 A.2d 1137, 1141 (1985); *Janicik v. Prudential Insurance Co.,* 305 Pa. Super. 120, 128, 451 A.2d 451, 454 (1982). The proponent must present evidence sufficient to make out a prima facie case "from which the court can conclude that the . . . class certification requirements are met." *Janicik,* 305 Pa. Super. at 130, 451 A.2d. at 455. If the defendant presents contrary evidence establishing an actual conflict on an essential fact, the proponent "bears the risk of non-persuasion." *Id.*

Given this context, the court will enumerate the factors it considered in ruling on class certification.

## I. *Numerosity*

To satisfy this criterion, the class must be both numerous and identifiable. A class is sufficiently numerous when "the number of potential individual plaintiffs would pose a grave imposition on the resources of the court and an unnecessary drain on the energies and resources of the litigants should [plaintiffs] sue individually." *Temple University v. Pennsylvania Department of Public Welfare,* 30 Pa. Commw. 595, 603, 374 A.2d 991, 996 (1977) (123 plaintiffs sufficiently numerous); *ABC Sewer Cleaning Co. v. Bell of PA,* 293 Pa. Super. 219,

225, 438 A.2d 616, 619 (1981) (250 plaintiffs sufficiently numerous); *Ablin Inc. v. Bell Telephone Co.,* 291 Pa. Super. 40, 51, 435 A.2d 208, 214 (1981) (204 plaintiffs sufficiently numerous). Where a class is narrowly and precisely drawn, but there are still so many potential members that joinder is impractical or impossible, the class is sufficiently delineated to satisfy the numerosity requirement. *Weismer v. Beech-Nut Nutrition Corp.,* 419 Pa. Super. 403, 408, 615 A.2d 428, 430 (1992), citing *Cribb v. United Health Clubs,* 336 Pa. Super. 479, 481, 485 A.2d 1182, 1184 (1984). A class is not sufficiently identifiable "where the class definition is so poorly established that the court [is unable to] discern who the potential class members are. . . ." *Weismer,* 419 Pa. Super. at 408, 615 A.2d at 430; *Dickler v. Shearson Lehman Hutton Inc.,* Phila. C.C.P. no. 9002-2653, opinion, April 17, 1997 (Levin, J.) (proposed class not identifiable because plaintiffs' inconsistent pleadings prevented court from identifying the class of potential plaintiffs).

The defendants do not object to certification of plaintiffs' proposed class on the issue of numerosity. The class which plaintiffs propose (all employers in the Commonwealth of Pennsylvania that have purchased or renewed retrospectively-rated or adjusted policies or other similarly loss-sensitive policies in the voluntary market since 1985) contains a sufficient amount of insurance purchasers such that joinder of those members is impracticable. Accordingly, this court rules that numerosity is satisfied.

## II. *Commonality*

For class certification, plaintiffs must also establish that their claim presents "questions of law or fact com-

mon to the class." Pa.R.C.P. 1702(2). "The common question of fact means precisely that the facts must be substantially the same so that proof as to one claimant would be proof as to all." *Allegheny County Housing Authority v. Berry,* 338 Pa. Super. 338, 342, 487 A.2d 995, 997 (1985); *Cook v. Highland Water and Sewer Authority,* 108 Pa. Commw. 222, 231-32, 530 A.2d 499, 504 (1987).

While the existence of individual questions essential to a class member's recovery is not necessarily fatal to the class, there must be a *"predominance* of common issues, shared by all the class members, which can be justly resolved in a single proceeding." *Weismer,* 419 Pa. Super. at 408-409, 615 A.2d at 431 (emphasis in original); *D'Amelio,* 347 Pa. Super. at 451, 500 A.2d at 1142 and *Janicik,* 305 Pa. Super. at 132, 451 A.2d at 457. See Pa.R.C.P. 1708(a)(1).

In cases involving contracts, if the circumstances surrounding the application for and issuance of each contract must be considered to determine defendant's liability then "it is impossible to find that there are questions of fact common to all class members." *Hayes v. Motorists Mutual Insurance Co.,* 370 Pa. Super. 602, 609, 537 A.2d 330, 333 (1987).

## A. Contract-Based Claims

Plaintiffs argue that the commonality requirement is satisfied because there was a common course of conduct among defendants, that of including illegal RMLs in the insurance contracts sold to the plaintiffs. Plaintiffs assert that defendants act similarly in the following five ways: (1) misrepresenting and inflating the applicable

tax multiplier used in calculating the final premium; (2) imposing illegal and unauthorized residual market assessments against voluntary market carriers; (3) using an illegally inflated loss conversion factor; (4) misrepresenting and illegally inflating the basic premium amounts; and (5) requiring insurers to purchase coverage that was unrequested and unnecessary. (Pls.' second am. compl. at ¶38(a)-(e).)

Defendants respond that their liability can't be decided in a class action because there are individual issues regarding each plaintiff's case which must be decided by the court. These issues include whether, in fact, RMLs were actually included in the contracts and whether or not the choice of law clauses contained in the individual contracts should be heeded in light of Pennsylvania's interest in the matter.

The court agrees that the plaintiffs' contract claim lacks sufficient commonality because class-wide adjudication of the contract claims would require the court to consider each individual policy and policyholder. Resolving plaintiffs' contract claim class-wide would require individual inquiries into (1) whether each policy actually contained RMLs, some of which plaintiffs claim are concealed, (2) whether each plaintiff was damaged as a result of such RMLs; and (3) whether each defendant's contact with the state of Pennsylvania rose to a level which would cause the state's other interests to outweigh its interest in upholding the contract.

Plaintiffs points to this court's decision in *Katlin v. Tremoglie,* no. 9706-2703, slip op. at 9 (Pa. C.C.P. June 29, 1999), which recognized that it is appropriate to bi-

furcate issues of liability from damages. In that case the court wrote that "a trial limited to the issue of liability is an efficient method of deciding [defendant's] liability," quoting *Cambanis*, 348 Pa. Super. at 51, 501 A.2d at 640. Plaintiff states, "Indeed, the court went on to express agreement that, under appropriate circumstances, 'certain issues or elements of a claim' may be certified." This court does not question that this is the state of the law, but rather does not believe that this case presents the appropriate circumstances.

In the *Katlin* and *Cambanis* matters the members of the proposed classes were in identical situations for purposes of liability.[70] The courts found that individual inquiries into plaintiffs' damages[71] do not defeat certification of a class action. However, in this case, plaintiff proposes the following procedure: "A finding by the jury that a carrier had a general policy and practice of imposing RMLs would be followed by a claims proceeding in which each class member would be required to present documentary proof that its policy contained an RML reflecting the carrier's general policy and practice." This would not be an inquiry into the amount of, or the existence of, damages, but rather would be done to determine defendants' liability as to each class member. This type

---

70. The named plaintiff in *Cambanis* filed her claim on behalf of the estate of her deceased husband and as a representative of the class of all others who had been similarly wrongfully denied no-fault work loss benefits. In *Katlin* the named plaintiff filed the claim "on behalf of himself and all other persons who were treated by unlicensed physician David Tremoglie at the Bustleton Guidance Center."

71. Such inquiry would not be limited to findings on the amount of each class member's damages, but could include the question of such damages' existence as well.

of individual inquiry is not supported by the case law and, in fact, defeats the very purpose of class action lawsuits. Indeed, the need for such an inquiry illustrates the predominance of individual issues in this case.

Additionally, there is an issue of choice of law in this case which defeats commonality. It cannot be assumed that the laws of Pennsylvania will apply to claims involving multi-state policies issued to multi-state employers. Although each of the contracts concerns dealings that may have an effect in Pennsylvania, some of the contracts have choice of law clauses which choose the law of other jurisdictions. The detailed individual analysis which would be required to determine which law applies to each contract is overwhelming. Ultimately this analysis could result in the laws of different states being applied to each individual contract.

We find that the plaintiffs have not satisfied the commonality criterion because common issues concerning the policies that the defendants issued do not predominate over individual issues surrounding each policy and policyholder.

## B. Fraud-Based Claims

Plaintiffs' fraud claims lack commonality because individual issues of reliance upon defendants' misrepresentations predominate over the common issues regarding defendants' conduct.

Fraud-based claims are unsuitable for class-wide resolution because resolving those claims typically requires individual proof of reliance and materiality. *Klemow v. Time,* 466 Pa. 189, 197, 352 A.2d 12, 16 (1975); *Di-*

*Lucidio v. Terminix,* 450 Pa. Super. 393, 402, 676 A.2d 1237, 1241 (1996); *Prime Meats Inc. v. Yochim,* 422 Pa. Super. 460, 467, 619 A.2d 769, 773 (1993).

Plaintiff argues that both materiality and reliance can be litigated class-wide under this court's rationale in *Lewin v. Saidel,* no. 9604-0015 (Dec. 19, 1997). In *Lewin* this court certified plaintiff's fraud claim because it determined, based on expert testimony, that a nondisclosure was material to all the plaintiffs.[72] Here, plaintiffs maintain that the materiality element can be decided class-wide because defendants uniformly issued policies which contained form language that misrepresented that they were in compliance with applicable law and regulations. Given the purported materiality of these alleged charges, plaintiffs argue that reliance can be presumed.

This court disagrees because while the contract language may have been identical in all of the policies issued by the defendants, the reliance of the proposed class members on that language is doubtful. Here, defendants communicated with plaintiffs individually during negotiation sessions prior to the issuance of the policies. At the certification hearing, defendants pointed to the statement of one of plaintiffs' employees, Mr. Harcharik, who stated, "I was focused on the bottom line cost and I was indifferent to how the premium was allocated." (Certifi-

---

72. In *Lewin* officers of the defendant bank failed to notify shareholders that another bank had offered to purchase the shareholders' bank. Plaintiffs' expert based his opinion that the nondisclosure of an offer to purchase the bank was material to each and every shareholder because of the bank's small size, low share liquidity, limited potential for expansion and various conditions in the market. *Lewin v. Saidel,* no. 9604-0015. (Mem. op., Dec. 19, 1997.)

cation hearing p. 227.) In *Lewin,* the class' claims focused on the adequacy of defendant's proxy statement. To resolve Lewin's claim, this court did not need to scrutinize other communications made between the plaintiff and defendant. Unlike in *Lewin,* to resolve plaintiffs' fraud claims class-wide, this court must consider the communications between individual defendants and plaintiff policyholders to determine whether each class member did, in fact, rely upon the contract language that the plaintiffs cite.

Given the factual dissimilarity between this case and *Lewin,* the court is bound to follow the holdings of *Prime Meats* and *DiLucidio* and not certify plaintiffs' fraud claims because they involve critical and individual issues of reliance and materiality.

## C. Statute of Limitations

Defendants assert that the application of the statute of limitations and the discovery rule to the class' claims preclude any finding that common issues predominate. They argue that the statute of limitations on some plaintiffs' claims began to run in 1985 and others in subsequent years. Defendants submitted the following argument in their memorandum of law in opposition to plaintiffs' motion for class certification:

"The plaintiffs' individual claims are based on 35 insurance contracts in force at various times between 1986 and 1996. Complaint ¶¶12-22. Of those, the policy periods of 28 of the contracts were concluded, and all compensable losses incurred, by February 6, 1994—four years before suit was brought—and no policy period

extended beyond March 8, 1996. *Id.* Thus, if Pennsylvania law were the only law that governed, many claims would be barred on their faces. See 42 Pa.C.S. §525 (West 1981 and Supp. 1998) (four-year limitations period for contract claims); 42 Pa.C.S. §5524 (West 1981 and Supp. 1998) (two-year limitations period for fraud claim)."

Plaintiffs respond by suggesting that fraud or misrepresentations on the defendants' part prevented the statute of frauds from running until the plaintiffs did, in fact, discover the misdeeds for which they now seek relief. As discussed above, fraud on the defendants' part is an issue which must be examined on an individual basis. Once the fraud issue is resolved as to each class member, even if fraud is found to be present in *each* transaction between insured and insurer, an individual statute of limitations analysis must commence. Defendants contend, therefore, that the existence of individualized issues and the need for individualized inquiries prevent common issues from predominating. The court will explain why the statute of limitations is an issue in this case that cannot be resolved class-wide.

Based on the evidence adduced in support of and against plaintiffs' motion for class certification, the court is convinced that the statute of limitations is a central issue in this case. Some insureds may have been aware of the defendants' alleged breaches as early as 1985, having negotiated their policies which began in that year and knowingly agreed to pay RMLs.

Persons who assert a cause of action are "under a duty to use all reasonable diligence to be properly informed of the facts and circumstances upon which a potential

right of recovery is based and to institute suit within the prescribed statutory period." *Pocono International Raceway v. Pocono Produce Inc.,* 503 Pa. 80, 84, 468 A.2d 468, 471 (1993). Under the discovery rule the statute of limitations is tolled during the time that a plaintiff, despite the exercise of reasonable diligence, is unable to determine his injury or its cause. *Id.* at 84, 468 A.2d at 471. In *Cochran v. GAF Corp.,* 542 Pa. 210, 217, 666 A.2d 245, 249 (1995), the Pennsylvania Supreme Court explained that "[u]nder [the reasonable diligence standard] the *plaintiff's actions must be evaluated* to determine whether he exhibited those qualities of attention, knowledge, intelligence and judgement which society requires its members for the protection of their own interests." (emphasis added) The court explained further that the standard is "sufficiently flexible . . . to take into account differences between persons and their capacity to meet certain situations and the circumstances confronting them at the time in question." *Id.* at 217, 666 A.2d at 249 (quoting *Burnside v. Abbott Laboratories,* 351 Pa. Super. 264, 292, 505 A.2d 973, 988 (1985)). Therefore, the discovery rule cannot be litigated on a class basis because the reasonable diligence standard requires an individual inquiry into each policyholder's knowledge of the defendants' actions and whether the policyholder exercised reasonable diligence to discover the cause of his or her injury. That a plaintiff's actions will be governed by an objective standard does not vitiate the need for an individualized inquiry into whether each class member meets that standard. Whether an insured meets the reasonable diligence standard will depend on whether the insured negotiated its policy, had knowledge of the presence of

RMLs and, generally, took actions to determine whether the insurance policy truly reflected the agreement that was negotiated.

Plaintiffs respond stating that "even if this court were to completely discredit plaintffs' allegations of fradulent concealment, *most* class members' claims are not time barred." (Plaintiffs' post-hearing memorandum, p. 23.) (emphasis added) Plaintiffs attempt to distinguish this case from *Antonoff v. First Fidelily Bank N.A.,* Phila. C.C.P. no. 9802-2825 (1999), stating that here, unlike in *Antonoff,* fraudulent concealments are not necessary to save every class member's claims. This is so, plaintiff avers, because some of the contracts are continuing. Pennsylvania law holds that contracts which are continuous, those which do not fix any certain time for payment or for the termination of the services, keep the statute of limitations from beginning to run until their completion. *Wm. B. Tenny Builder and Developer v. Dauphin Deposit Bank and Trust Co.,* 302 Pa. Super. 342, 346-47, 448 A.2d 1073, 1075 (1982). However, this argument only serves to create yet another individualized analysis for the court to perform as to each class member, determining which contracts are continuing and which are not. Although some of the contracts may ultimately be determined to be continuing, both continuing and non-continuing contracts then must go through the statute of limitations and discovery rule analysis already discussed.

The evidence reveals that the insureds' knowledge about the defendants' actions and exercise of reasonable diligence varied as did their contracts' status as a "continuing" contract. Therefore, we conclude that plaintiffs have not satisfied the commonality criterion and that

common issues about defendants' conduct do not predominate over individual issues concerning insureds' exercise of reasonable diligence, insureds' knowledge about the defendants' actions and individual contracts' "continuing" status. *Weismer v. Beech-Nut Nutrition Corp.,* 419 Pa. Super. 403, 408-409, 615 A.2d 428, 431 (1992) (finding that statute of limitations, among another issues, prevented common issues from predominating over individual issues).

### III. *Typicality*

Plaintiffs must also demonstrate that their "claims or defenses . . . are typical of the claims or defenses of the class." Pa.R.C.P. 1702(3). This factor requires that "the class representative's overall position on the common issues is sufficiently aligned with that of the absent class members to ensure that her pursuit of her own interests will advance those of the proposed class members." *D'Amelio,* 347 Pa. Super. at 458, 500 A.2d at 1146; *Janicik,* 305 Pa. Super. at 134, 451 A.2d at 457; *Ablin,* 291 Pa. Super. at 47, 435 A.2d at 212. See also, 1 Newberg on Class Actions §1115a.

"Failure to find commonality . . . necessitates a conclusion that the typicality requirement of Rule 1702(3) has likewise not been met." *Hayes v. Motorists Mutual Insurance Co.,* 370 Pa. Super. 602, 610, 537 A.2d 330, 334 (1987). We determined earlier that plaintiffs have not satisfied the commonality criterion because a variety of facts and circumstances—unique to each plaintiff—must be considered to determine defendants' liability. Consequently, the plaintiff has failed to satisfy

typicality as well. *Hayes,* 370 Pa. Super. at 610, 537 A.2d at 334.

## IV. *Adequacy of Representation*

For the class to be certified, this court must also conclude that the plaintiffs "will fairly and adequately assert and protect the interests of the class." Pa.R.C.P. 1702(4). Adequate representation is evaluated under considerations set forth in Pennsylvania Rule of Civil Procedure 1709. However, having determined that plaintiff failed to satisfy the typicality and commonality requirements, it is "unnecessary for the trial court to consider the remaining . . . elements." *Weismer,* 419 Pa. Super. at 410, 615 A.2d at 431.

## V. *Fair and Efficient Method for Adjudication*

Finally, the court would generally address whether allowing plaintiffs to proceed with adjudication of this suit as a class action would be both fair and efficient. The factors to be evaluated are set forth in Pennsylvania Rule of Civil Procedure 1708. As above, having determined that plaintiff has failed to satisfy the requirements for certification of this case as a class action, we need not reach the merits of this inquiry. *Weismer,* 419 Pa. Super. at 410, 615 A.2d at 431.

## CONCLUSIONS OF LAW

(1) The class is sufficiently numerous that joinder of all its members would be impracticable.

(2) There is not a predominance of questions of law and fact common to the class.

(3) The claims raised by the representative party are not typical of the claims belonging to and necessary for, the protection of absent class members.

(4) This court was not required to determine whether the proposed class representative will fairly and adequately assert and protect the interests of the class under the criteria set forth in Rule1709.

(5) This court was not required to determine whether allowing this matter to proceed as a class action would provide a fair and efficient method for adjudication of the controversy under the criteria set forth in Rule 1708.

For the foregoing reasons, this court determines that the instant case is not appropriate for disposition as a class action and enters the attached order.

## ORDER

And now, January 10, 2000, in consideration of plaintiffs' motion for class certification and all submissions related thereto, it is hereby ordered that plaintiffs' motion for class certification is denied.